IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| SHERWIN ALUMINA L.P., | § | |
| | § | |
| Plaintiff/Counter-Defendant, | § | Civil Action |
| | § | No. C-06-183 |
| v. | § | No. C-06-210 |
| | § | |
| ALUCHEM, INC., | § | |
| | § | |
| Defendant/Counter-Claimant. | § | |

## ORDER GRANTING ALUCHEM, INC.'S FIRST MOTION FOR SUMMARY JUDGMENT

On this day came on to be considered Defendant/Counter-Claimant AluChem, Inc.'s ("AluChem") first motion for summary judgment (D.E. 16) against Plaintiff/Counter-Defendant Sherwin Alumina L.P. ("Sherwin Alumina").[1]  For the reasons set forth below, AluChem's first motion for summary judgment is GRANTED in its entirety.

### I.   Jurisdiction

The Court has diversity jurisdiction over this consolidated

---

[1]AluChem filed its first motion for summary judgment, entitled "Motion for Preliminary Injunction, Permanent Injunction, and Summary Judgment," on May 22, 2006 (D.E. 16). Per the request of the parties due to ongoing settlement negotiations, the Court denied AluChem's first motion for summary judgment on August 16, 2006, without prejudice, with leave for AluChem to re-assert its motion at a later date (D.E. 66).  On February 20, 2007, AluChem filed a motion to reinstate its first motion for summary judgment (D.E. 85, seeking to reinstate D.E. 16).  On February 21, 2007, the Court granted AluChem's motion to reinstate its first motion for summary judgment (D.E. 88).  The Court's Order noted that the Court only reinstated the portion of D.E. 16 that consisted of AluChem's motion for summary judgment, not the portions of D.E. 16 that consisted of AluChem's "motion for permanent injunction or AluChem's motion for preliminary injunction." (D.E. 88, n. 1).

action pursuant to 28 U.S.C. § 1332(a), since Sherwin Alumina is a citizen of Delaware and Texas, AluChem is a citizen of Ohio, and the amount in controversy exceeds $75,000.

## II.  **Factual Background**

The following facts are not in dispute:  In 2001, AluChem approached Sherwin Alumina regarding the possibility of Sherwin Alumina supplying AluChem with certain calcined, chemical grade alumina products (RC1, SC2 and SC10).[2]  (MX-6, Ingersoll Dep., 126:8-23; RX-2, Ingersoll Aff., ¶ 2).[3]  In 2001, Sherwin Alumina agreed to conduct a number of trial runs producing the calcined alumina products, using "kiln 8," existing equipment at Sherwin Alumina's Texas plant.[4]  (IPTC Tr., 65:19-22; Ingersoll Dep., 129:20-130:5; Ingersoll Aff., ¶ 2; RX-3, Ballou Aff., ¶ 6).  While Sherwin Alumina was completing the trial runs, Sherwin Alumina manufactured the calcined alumina products on kiln 8 under a temporary permit from the Texas Commission on Environmental Quality

---

[2]The worldwide alumina market is currently very tight.  (MX-8, Mineral Price Watch).  Sherwin Alumina has very few competitors for calcined alumina production, and besides Sherwin Alumina, there is only one other manufacturer of SC2 in North America.  (Ingersoll Dep., 76:24-77:25).

[3]For ease of reference, movant's exhibits are designated "MX" and respondent's exhibits are designated "RX."

[4]Sherwin Alumina does not use any equipment other than kiln 8 to manufacture calcined alumina products for AluChem.  (RX-1, S. Bailey Aff., ¶ 2).  However, kiln 8 is not used exclusively for AluChem, for approximately twenty-eight days per year kiln 8 is used as a "supplementary calcination device" while Sherwin Alumina is conducting maintenance on its main calciners.  (IPTC Tr., 120:8-11).

("TCEQ").  (Ingersoll Dep., 136:15-137:13; Ingersoll Aff., ¶ 1).
In the course of completing these trial runs, Sherwin Alumina
experienced numerous "reportable events," whereby Sherwin Alumina
had to report dust emissions to TCEQ by a certain time.  (IPTC Tr.,
69:9-12, 71:11-12; S. Bailey Aff., ¶ 4).

After completing at least six trial runs using kiln 8 to
produce the calcined alumina products, Sherwin Alumina and AluChem
entered into a Supply Agreement, whereby Sherwin Alumina agreed to
provide AluChem with designated calcined alumina products for a
certain price paid by AluChem (hereinafter, the "Supply
Agreement").  (MX-3, RX-4, Supply Agreement; IPTC Tr., 68:12-14).
The original term of the Supply Agreement was for two years, from
January 1, 2002 through December 31, 2003.  (Supply Agreement).[5]
The Supply Agreement is "evergreen," meaning that the Agreement
continues in effect for subsequent two-year terms unless either
party terminates the Agreement in writing twelve months prior to
the end of the current contract term.  (Supply Agreement, Attach.
3, ¶ 3).  Per the terms of the Supply Agreement, if one party were
to give written notice of termination of the Agreement, the
Agreement would continue in force until the end of that calendar
year and for the entire calendar year thereafter, at which point it
would terminate.  (Id.).

---

[5]In late 2005, Sherwin Alumina and AluChem were engaged in
the process of negotiating an entirely new three-year contract.
(IPTC Tr., 175:4-23).  That three year contract was never
finalized or signed.  (IPTC Tr., 176:3-5).

Sherwin Alumina did not receive a permanent permit from TCEQ to produce the calcined alumina products using kiln 8 until December, 2004. (IPTC Tr., 67:7-9, 68:19-24).[6] Prior to that time, which included the entire first two-year term of the Supply Agreement, Sherwin Alumina continued to produce the calcined alumina products under the TCEQ temporary permit.[7] (Id.). During this time period, Sherwin Alumina again experienced "reportable events" in manufacturing calcined alumina products for AluChem. (IPTC Tr., 69:13-24, 71:11-12; S. Bailey Aff., ¶ 4). These reportable events concerned dust emissions that had to be reported to TCEQ by a certain date. (Id.).

As neither party had issued notice of termination of the Supply Agreement by the end of 2003, the Agreement continued for another two-year term, from January 1, 2004 through December 31, 2005. (Supply Agreement, Attach. 3, ¶ 3). As noted above, during this two-year term, Sherwin Alumina received its permanent permit from TCEQ at the end of 2004. (IPTC Tr., 67:7-9, 68:19-24). At the point Sherwin Alumina received the permanent permit from TCEQ,

---

[6]Sherwin Alumina's permanent permit to produce calcined alumina products using kiln 8 (Permit No. 48455) was amended in December, 2005. (RX-3B, Letter and Attachments re: Permit Amendment).

[7]At the initial pretrial and scheduling conference in this case, held on June 23, 2006, Peter Bailey, Sherwin Alumina former Chief Executive Officer and then-Vice President of Operations, testified that Sherwin Alumina considered all calcined alumina production runs prior to receiving the permanent permit to be "trial runs." (IPTC Tr., 66:23-67:1).

Sherwin Alumina had already completed at least twenty month-long runs producing calcined alumina products for AluChem. (IPTC Tr., 8:22-24). Again, during the January 1, 2004 through December 31, 2005 term of the Supply Agreement, Sherwin Alumina continued to experience reportable events with kiln 8 regarding dust emissions, which Sherwin Alumina had to report to TCEQ by the required time. (S. Bailey Aff., ¶ 3; Ingersoll Aff., ¶ 4; RX-1A, Excursion Logs; Ballou Aff., ¶ 4; IPTC Tr., 71:11-12).

Since neither party had issued notice of cancellation of the Supply Agreement by the end of 2005, the Agreement was extended for another two-year term, from January 1, 2006 through December 31, 2007. (Supply Agreement, Attach. 3, ¶ 3). During 2005 and the first part of 2006, Sherwin Alumina continued to produce calcined alumina products for AluChem using kiln 8, and Sherwin Alumina continued to experience reportable events regarding dust emissions, which had to be timely reported to TCEQ. (S. Bailey Aff., ¶ 3; Ingersoll Aff., ¶ 4; Excursion Logs; Ballou Aff., ¶ 4; IPTC Tr., 71:11-12).

Sherwin Alumina has not completed one production run of calcined alumina products for AluChem using kiln 8 without experiencing events that must be reported to TCEQ. (IPTC Tr., 71:11-12) ("We have not made one run within the permit") (S. Bailey Aff., ¶ 3; Excursion Logs; Ingersoll Aff., ¶ 4; Ballou Aff., ¶ 4). TCEQ has never ordered Sherwin Alumina to make repairs to or shut

down kiln 8.  (IPTC Tr., 78:4-12; Ingersoll Dep., 189:3-9, 192:6-8; MX-14, S. Bailey Dep., 30:3-8).   There is no indication that Sherwin Alumina has been fined by TCEQ as a direct result of the actual dust emissions from kiln 8.  (IPTC Tr., 74:22-25; Ingersoll Aff., ¶ 3; Ballou Aff., ¶ 3; RX-3A, TCEQ Agreed Order).[8]  Further, although Sherwin Alumina had applied to TCEQ for amendments to other permits, Sherwin Alumina never approached TCEQ to request an amendment to its permit regarding kiln 8.  (IPTC Tr., 225: 18-226:1).

In March, 2006, Sherwin Alumina underwent a change in ownership and management.  (IPTC Tr., 59:8-20).  After the change in ownership, 49% of Sherwin Alumina was owned by Glencore, a foreign trading company, and 51% of the company was owned by China Minmetals, a foreign entity owned by the People's Republic of China.  (IPTC Tr., 40:10-15; 41:13-17).  In March, 2006, Dr. Houshang Shams became the new Chief Executive Officer of Sherwin Alumina.  (IPTC Tr., 59:15-17, 41:20-22).

On April 26, 2006, Mr. Jerry Hooper of Sherwin Alumina sent

---

[8]Sherwin Alumina has submitted evidence that TCEQ has fined Sherwin Alumina for violations that "occurred while Sherwin was making the AluChem products" on kiln 8.  (Ingersoll Aff., ¶ 3; Ballou Aff., ¶ 3).  However, there is no indication in the corresponding documentation from TCEQ that the fine was due to actual dust emissions, rather than reporting violations or other human error.  (TCEQ Agreed Order).  Rather, at the IPTC hearing on June 23, 2006, Peter Bailey of Sherwin Alumina testified that the portions of the TCEQ fine that related to kiln 8 were classified as "human error".  (IPTC Tr., 79:22-25) ("[w]e have been fined on very few occasions, I think two occasions, and that is due to human error.").

Mr. Ed Butera of AluChem a letter stating that Sherwin Alumina had "elected to exercise [its] rights under the Force Majeure provision contained in the [Supply Agreement]." (MX-9, April 26, 2006 letter from J. Hooper to E. Butera). Sherwin Alumina claimed that its declaration of force majeure was due to environmental concerns, specifically "emission events in violation of the regulations of [TCEQ]." (Id.). The letter stated that Sherwin Alumina intended to immediately cease production of calcined alumina products for AluChem. (Id.). As referenced above, Sherwin Alumina sent this letter to AluChem during the two-year term of the Supply Agreement scheduled to run from January 1, 2006 through December 31, 2007. (Supply Agreement, Attach. 3, ¶ 3).

On May 2, 2006, Peter Bailey, Sherwin Alumina former CEO and then-Vice President of Operations[9], sent Ronald Zapletal of AluChem an email stating that Sherwin Alumina and AluChem had reached an agreement that "implied that [Sherwin Alumina] had withdrawn [its] Force Majeure" and that Sherwin Alumina had "committed to make product for AluChem, under controlled conditions, on an ongoing basis, over the next six months".[10] (MX-1, May 2, 2006 e-mail from

---

[9]At the IPTC hearing on June 23, 2006, Mr. Bailey testified that he was CEO of Sherwin Alumina until March 20, 2006, and at the time of the IPTC hearing, his position was Vice President of Operations. (IPTC Tr., 56:19-25). Based on recent Court filings, Mr. Bailey appears to have later assumed the position of Vice President of Plant Management for Sherwin Alumina.

[10]Sherwin Alumina has since elected to assert its force majeure claim in this consolidated action, and Sherwin Alumina asserts its force majeure claim in its current operative

P. Bailey to R. Zapletal).   Mr. Bailey wrote that "[i]t seems
therefore, that we are now, really only quibbling over the
additional price incentive".[11]   (Id.).   On May 7, 2007, Houshang
Shams, current CEO of Sherwin Alumina, sent an email to Ed Butera
of AluChem stating that Sherwin Alumina would "run one more time".
(MX-15, May 7, 2006 email from H. Shams to E. Butera).   Following
its declaration of force majeure, Sherwin Alumina has been
supplying calcined alumina products to AluChem, although at a price
higher than that set in the Supply Agreement.[12]

## III.  Procedural Background

     On April 26, 2006, the same day it sent its letter to AluChem
regarding force majeure, Sherwin Alumina filed a declaratory
judgment action in this Court, requesting the Court to declare that
(1) Sherwin Alumina is not in breach of contract for asserting
force majeure; and (2) Sherwin Alumina has the right to terminate

_____

pleading, its Third Amended Complaint.  (D.E. 83, Third Amended
Complaint, ¶ 5).  Sherwin Alumina seeks a declaratory judgment
that it was within its rights to declare force majeure on April
26, 2006.  (Id.).

     [11]Approximately ninety percent of Sherwin Alumina's business
is manufacturing and selling metal grade alumina.  (IPTC Tr.,
60:1-4).  Metal grade alumina is used to make calcined alumina
products.  While the spot price for metal grade alumina
fluctuates, the spot price has been steadily increasing due to
tight supply, reaching over $600 per ton at one point in 2006.
(Mineral Price Watch).

     [12]For example, in the May, 2006 run, Sherwin Alumina charged
AluChem an additional $60 per ton, resulting in a $480,000
increased cost for AluChem.  (D.E. 87, AluChem's Response to
Sherwin Alumina's Motion for Summary Judgment, Exh. 5, Butera
Decl.).

its contract with AluChem under the contract's force majeure clause.  (D.E. 1, Original Complaint, ¶ 5).[13]

On May 3, 2006, AluChem filed a separate action against Sherwin Alumina in the United States District Court for the Southern District of Ohio, seeking a declaratory judgment that Sherwin Alumina's declaration of force majeure was illegitimate, and alleging causes of action for specific performance, breach of contract and breach of the covenant of good faith.  (D.E. 1, Complaint, Case No. 06-210).[14]  On May 10, 2006, Judge Susan Dlott of the Southern District of Ohio transferred the case to this Court, pursuant to the "first-to-file" rule, and the case was assigned Case No. 06-210.  (D.E. 9, 10, Case No. 06-210).  On May 18, 2006, this Court consolidated the two actions, with Case No. 06-183 as the lead case and Case No. 06-210 as the member case.  (D.E. 15).

---

[13]Sherwin Alumina has since amended its Original Complaint, and its current operative pleading is its Third Amended Complaint for Declaratory Relief, filed on February 20, 2007 (D.E. 83). Sherwin Alumina's Third Amended Complaint seeks additional declaratory relief, mainly related to the issue of pricing in Sherwin Alumina's contract with AluChem.  (D.E. 83, Third Amended Complaint, ¶ 5).

[14]AluChem has since amended its Complaint against Sherwin Alumina, and AluChem's current operative complaint is its First Amended Original Complaint, filed on February 23, 2007 (D.E. 93). In its First Amended Original Complaint, AluChem has added claims against Sherwin Alumina for fraud and violations of the Texas Deceptive Practices Act, and AluChem has added claims against Sherwin Alumina employees Houshang Shams, Mark Liu and Jerry Hooper for fraud and conspiracy to defraud.  (D.E. 83, First Amended Original Complaint, ¶¶ 65-69).

On May 11, 2006, AluChem filed its Original Answer and Counterclaim in Case No. 06-183, seeking declaratory relief regarding the legitimacy of Sherwin Alumina's force majeure declaration, and alleging causes of action for specific performance, breach of contract and breach of the covenant of good faith.  (D.E. 4, Original Counterclaim, ¶¶ 35-52).[15]

On May 22, 2006, AluChem filed its first motion for summary judgment in this consolidated action, entitled "Motion for Preliminary Injunction, Permanent Injunction, and Summary Judgment" (D.E. 16).[16]  AluChem and Sherwin Alumina have engaged in lengthy settlement conferences in this case, and on July 31, 2006, the parties requested that the Court postpone ruling on AluChem's motion for summary judgment, pending ongoing settlement negotiations.  (D.E. 57, seeking to postpone ruling on D.E. 16). On August 16, 2006, in response to the parties' motion to postpone ruling, the Court denied AluChem's motion for summary judgment (D.E. 16) without prejudice, with leave to re-assert at a later

---

[15]AluChem has since amended its Counterclaim against Sherwin Alumina.  AluChem filed its current operative Counterclaim on March 2, 2007 (D.E. 98, Counterclaim filed with AluChem's Answer to Sherwin Alumina's Third Amended Complaint).  In its Amended Counterclaim, AluChem seeks declaratory judgment regarding AluChem's contract with Sherwin Alumina, and AluChem brings claims against Sherwin Alumina for breach of contract, specific performance, breach of the covenant of good faith, violations of the Texas Deceptive Trade Practices Act, and for fraud.  (D.E. 98, Amended Counterclaim, ¶¶ 35-61).

[16]The Court held a hearing on AluChem's motion on June 23, 2006, together with the initial pretrial and scheduling conference in this case.  (See, generally, IPTC Tr.).

date.   (D.E. 66).   Since settlement negotiations still had not produced a resolution to the parties' claims, on February 20, 2007, AluChem filed a motion to reinstate its first motion for summary judgment (D.E. 85, seeking to reinstate D.E. 16).   On February 21, 2007, the Court granted AluChem's motion to reinstate, and the Court reinstated AluChem's first motion for summary judgment.[17] (D.E. 88, reinstating D.E. 16).[18]

In its reinstated motion, AluChem moves for summary judgment on the following issues: (1) AluChem seeks summary judgment on its claim for declaratory relief that Sherwin Alumina's declaration of force majeure was illegitimate; and (2) AluChem seeks summary judgment on its claim that it is entitled to specific performance of the terms of the Supply Agreement entered into between Sherwin Alumina and AluChem.   In its motion, AluChem argues that force majeure does not apply because Sherwin Alumina has acknowledged that it can continue to produce calcined alumina products for

---

[17]The Court only reinstated the portion of D.E. 16 requesting summary judgment, the Court specifically did not reinstate AluChem's motion for preliminary injunction and motion for permanent injunction, which are also part of AluChem's original D.E. 16.

[18]Of note, AluChem has a second motion for summary judgment pending in this action (D.E. 87), and Sherwin Alumina also has a pending motion for summary judgment (D.E. 86).   Sherwin Alumina and Houshang Shams, Mark Liu and Jerry Hooper also have a pending motion to dismiss AluChem's First Amended Original Complaint (D.E. 96).   This Order only specifically addresses Docket Entry 16, it does not directly address the other above-referenced pending motions.   However, the Court notes that this Order may necessarily resolve issues raised in the other pending dispositive motions in this case.

AluChem, and Sherwin Alumina has not experienced an event "beyond its reasonable control" to prevent it from supplying calcined alumina products to AluChem. (D.E. 16, pp. 5-15). AluChem also argues that it is entitled to specific performance because the calcined alumina products Sherwin Alumina produces for AluChem are "exceedingly unique goods that cannot be replaced by or substituted with any other products available for purchase." (D.E. 16, p. 4). AluChem has offered evidence in support of its summary judgment motion, including excerpts of the depositions of Sandra Bailey and Chester Ingersoll, a memorandum re: calcined alumina production written by Sandra Bailey, and correspondence between Sherwin Alumina and AluChem regarding the production of calcined alumina products. See D.E. 16, attachments (Movant's Exhibits ("MX") 1-17).[19]

Sherwin Alumina filed its response brief in opposition to AluChem's first motion for summary judgment on June 14, 2006 (D.E. 29). Sherwin Alumina argues that there is a genuine issue of material fact as to whether Sherwin Alumina's performance under the Supply Agreement was excused by the Agreement's force majeure clause, and whether it was within Sherwin Alumina's reasonable control to manufacture calcined alumina products for AluChem. (D.E. 29, p. 2). Sherwin Alumina also argues that AluChem is not

---

[19]Of note, on June 23, 2006, AluChem also filed a reply in support of its first motion for summary judgment. (D.E. 17, Case No. 06-210).

entitled to specific performance because Sherwin Alumina did not breach its contract with AluChem.  Sherwin Alumina further argues that it is excused from having to perform under the contract pursuant to the doctrines of illegal contract, mutual mistake, and commercial impracticability, and because of a lack of financial security.  (Id.).  Sherwin Alumina has offered evidence in support of its response, including affidavits of Chester Ingersoll, Sandra Bailey and Tom Ballou, excursion logs regarding the kiln used to manufacture calcined alumina products for AluChem, and documents from the Texas Commission on Environmental Quality.  See D.E. 29, attachments (Respondent's Exhibits ("RX") 1-10).

**IV.  Discussion**

      **A.   Summary Judgment Standard**

Federal Rule of Civil Procedure 56 states that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see also Judwin Props., Inc., v. U.S.

<u>Fire Ins. Co.</u>, 973 F.2d 432, 435 (5th Cir. 1992).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Wallace v. Texas Tech. Univ.</u>, 80 F.3d 1042, 1046-1047 (5th Cir. 1996). If the nonmovant bears the burden of proof on a claim, the moving party may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 325; <u>Ocean Energy II, Inc. v. Alexander & Alexander, Inc.</u>, 868 F.2d 740, 747 (5th Cir. 1989).

Once the moving party has carried its burden, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 270 (1968); <u>see</u> <u>also</u> <u>Schaefer v. Gulf Coast Reg'l Blood Ctr.</u>, 10 F.3d 327, 330 (5th Cir. 1994) (stating that nonmoving party must "produce affirmative and specific facts" demonstrating a genuine issue).

When the parties have submitted evidence of conflicting facts, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Willis v. Roche Biomedical Labs., Inc.</u>, 61 F.3d 313, 315 (5th Cir. 1995).

Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the nonmoving party, no reasonable jury could return a verdict for that party. See, e.g., Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

**B.    Sherwin Alumina is Not Excused from Performance of the Supply Agreement by Force Majeure**

### 1.    Force Majeure

Force majeure clauses in contracts are enforceable under Texas law. See GT & MC, Inc. v. Texas City Ref., Inc., 822 S.W.2d 252, 259 (Tex. App.--Houston [1st Dist.] 1991); Guillory Farms, Inc. v. Amigos Canning Co., 966 S.W.2d 830, 837 (Tex. App.--Beaumont 1998). While the theory of force majeure has been historically linked to impossibility of performance, the scope and application of a force majeure clause depends on the terms of the contract at issue. See Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc., 157 S.W.3d 462, 466 (Tex. App.--Houston [14th Dist.] 2004) ("Regardless of its historical underpinnings, the scope and application of a force majeure clause depend on the terms of the contract"); Sun Operating Ltd. P'ship v. Holt, 984 S.W.2d 277, 282-83 (Tex. App.--Amarillo 1998) ("when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure"); Perlman v. Pioneer Ltd. P'ship, 918 F.2d 1244, 1248 (5th Cir. 1991); Atl. Richfield Co. v. ANR Pipeline Co., 768 S.W.2d 777, 781 (Tex. App.--

Houston [14th Dist.] 1989) ("the parties were at liberty to define force majeure in whatever manner they desired").[20]

### 2.  Supply Agreement Force Majeure Clause

The Supply Agreement contains a force majeure clause, which states as follows:

> Seller shall not be liable for failure or delay in performance under this Order due in whole or in part to causes such as an act of God, strike, lockout or other labor dispute, civil commotion, sabotage, fire, flood, explosion, acts of any government, unforeseen shortages or unavailability of fuel, power, transportation, raw materials or supplies, inability to obtain or delay in obtaining necessary equipment or governmental approvals, permits, licenses or allocations, and any other causes which are not within the reasonable control of Seller, whether or not of the kind specifically enumerated above. Under any such circumstances, Seller shall have the additional time needed to complete this Order and the right to allocate its available supply, in the manner it selects, to itself and amount any or all customers, including, but not limited to, it[s] subsidiaries and affiliates.

(Supply Agreement, Attach. 1, ¶ 7).  Sherwin Alumina claims that it is excused from further performance under the Supply Agreement based on the force majeure clause, because "[i]t is not within Sherwin's reasonable control to avoid violating its air permit without having to purchase new equipment in order to be able to

---

[20]Of note, if a contract's force majeure clause concludes its "litany of force majeure events by mentioning causes beyond [the seller's reasonable] control," then "the juxtaposition evince[s] an intent that the qualification regarding control apply to each of the foregoing force majeure events." Sun Operating Ltd. P'ship, 984 S.W.2d at 288.  Accordingly, "before any event can be successfully invoked as force majeure by the [seller], it must be outside [the seller's] reasonable control." Sun Operating Ltd. P'ship, 984 S.W.2d at 288.

manufacture the AluChem products and to avoid further violation of the TCEQ regulations." (D.E. 29, Response, ¶ 1.11). However, for the reasons set forth below, there is no genuine issue of material fact that Sherwin Alumina is not entitled to declare force majeure under the terms of the Supply Agreement.

### 3. It is Within Sherwin Alumina's Reasonable Control to Continue to Produce Calcined Alumina Products for AluChem

The undisputed facts show that it is within Sherwin Alumina's reasonable control to continue performance under the Supply Agreement, the issue is the cost to Sherwin Alumina to upgrade its equipment. See MX-7, RX-9, April 26, 2006 S. Bailey[21] Memorandum to L. Bittle and C. Ingersoll, p. 4 (stating that the dust emission standard for kiln 8 could be achieved with a "significant capital investment", and that a "dust-free operation" of kiln 8 is obtainable, although at a higher economic cost); Ingersoll Aff., ¶ 5 (stating that it would cost "many millions of dollars" for Sherwin Alumina to manufacture calcined alumina products for AluChem without dust emission problems).

The undisputed facts set forth above contradict Sherwin Alumina's claim of force majeure in its April 26, 2006 letter, whereby Sherwin Alumina claims that "there is **no feasible way** for

---

[21]Sandra Bailey is a Sherwin Alumina Senior Production Engineer, she oversees ceramic alumina kiln burns and environmental reporting. (S. Bailey Dep., 1:14-24).

us to manufacture these products for AluChem without being in continual violation of the requirements set forth in our air permit." (April 26, 2006 Letter) (emphasis added). Sherwin Alumina had previously improved kiln 8, and the undisputed facts indicate that with continued investment, it was within Sherwin Alumina's reasonable control to continue manufacturing calcined alumina products for AluChem. (Ingersoll Aff., ¶ 5; S. Bailey Mem., p. 4; S. Bailey Aff., ¶ 5).

Force majeure in this case, pursuant to the terms of the Supply Agreement, means that Sherwin Alumina was not able to produce the product, at all or within the time specified by the contract, "due to events beyond [Sherwin Alumina's] reasonable control." (Supply Agreement, Attach. 1, ¶ 7). Under the terms of Supply Agreement, Sherwin Alumina is not entitled to declare force majeure because the costs of compliance were higher than Sherwin Alumina would have liked or anticipated. (Supply Agreement, Attach. 1, ¶ 7); Valero Transmission Co. v. Mitchell Energy Corp., 743 S.W.2d 658, 663 (Tex. App.--Houston [1st Dist.] 1987) (finding party could not invoke contract's force majeure clause due to higher costs of contract performance, since "a contractual obligation cannot be avoided simply because performance has become more economically burdensome than a party anticipated"); see also Schroeder v. Snoga, 1997 WL 428472, *4 (Tex. App.--San Antonio 1997) (finding it was within well operator's reasonable control to

rectify violations at his well-site to bring well into compliance with Texas Railroad Commission rules).

> ### 4.   Sherwin Alumina Cannot Declare Force Majeure Based on a Mere Possibility of TCEQ Action

Further, Sherwin Alumina's declaration of force majeure was premature:  The undisputed facts show that there has never been a state compelled shutdown of kiln 8, nor has TCEQ ever shut down any other part of the Sherwin Alumina plant as a result of Sherwin Alumina's manufacture of calcined alumina products for AluChem. (Ingersoll Dep., 189:6-9, 192:6-8, 193:32-194:3; IPTC Tr., 78:4-12; S. Bailey Dep., 30:3-8).  TCEQ has not ordered Sherwin Alumina to make repairs to kiln 8, nor has TCEQ given Sherwin Alumina any indication that TCEQ is going to revoke Sherwin Alumina's permit to produce the calcined alumina products using kiln 8.  (Id.; IPTC Tr., 124:8-11).  Further, there is no indication that Sherwin Alumina has been fined by TCEQ as a result of actual dust emissions from kiln 8.  (IPTC Tr., 74:22-25; Ingersoll Aff., ¶ 3; Ballou Aff., ¶ 3; TCEQ Agreed Order).  At the very least, before declaring force majeure, Sherwin Alumina could have approached TCEQ to apply for an amendment to its kiln 8 calcined alumina permit.  Former CEO and then-Vice President of Operations Peter Bailey testified that Sherwin Alumina had applied to TCEQ for permit amendments on many occasions, but that Sherwin Alumina never made any such application regarding kiln 8.  (IPTC Tr., 225:18-226:6).  Mr. Bailey testified

that he was "not sure the TCEQ would listen to it [an application for an amendment]" and that while TCEQ "considers economic hardship", Mr. Bailey was "not sure that would wash on [k]iln 8".[22] (Id.).

The undisputed facts show that Sherwin Alumina declared force majeure based on what *might happen* with TCEQ, not what actually took place with government regulators.  See, e.g., IPTC Tr., 78:14-17 (testimony of Peter Bailey that Sherwin Alumina was on TCEQ's "radar screen" and that "the event *will eventually be* that they will ask us to either remedy it [the dust emissions] or stop it") (emphasis added).[23]  This eventuality of a possible forced repair

_____

[22]Of note, Sherwin Alumina did not make any effort to terminate the Supply Agreement in 2002, 2003, 2004 or 2005, even though they were using the same equipment and maintain that they were "operating outside of their permit" during the entire duration of the contract.  (Ingersoll Dep., 133:13-20).  Based on Sherwin Alumina's claims, the "concern" over TCEQ action would have been there throughout the 2002-2005 period, but Sherwin Alumina did not choose to declare force majeure over this "concern" until April, 2006.  (April 26, 2006 Letter).  Moreover, Sherwin Alumina seems well able to navigate the potential minefields of TCEQ regulations and inspections, as evidenced by a January 5, 2006 email re: from Sherwin Alumina Environmental Manager Tom Ballou re: an upcoming TCEQ visit.  (D.E. 86, Sherwin Alumina's Motion for Summary Judgment, Exh. 36).  In the email, Mr. Ballou speaks of only conducting certain activities while TCEQ representatives are present, and that while TCEQ representatives are on-site, "[i]t would be a good time to bring all the equipment down for some routine maintenance."  (Id.).  Mr. Ballou writes that "[w]e need to impress [TCEQ] that we are not the world's worst polluters."  (Id.).

[23]Sherwin Alumina even states in its response that "Sherwin is *concerned* that the TCEQ *may* continue to issue civil penalties or shut down its plant."  (D.E. 29, Response, ¶ 1.8).

or shutdown is not a force majeure event today, rather it is a possibility that Sherwin Alumina <u>may</u> have to declare force majeure in the future.

The mere possibility of a shutdown of kiln 8 or some further action by TCEQ is not sufficient to declare force majeure. <u>See</u> <u>Perlman</u>, 918 F.2d at 1249 ("[w]e require more than the mere possibility or unsupported conclusion of the existence of hindrance by government regulations to relieve [a party] of [its] obligations under the contract -- an actual, material hindrance must occur before performance is excused.")[24]; <u>Oosten v. Hay Haulers Dairy</u> <u>Employees & Helpers Union</u>, 45 Cal.2d 784, 789 (1955), <u>cert. denied</u>, 351 U.S. 937 (1956) (rejecting the defense of impossibility of performance where the defense was premised only on what might happen in the future).  Further, under the terms of the Supply

---

[24]In <u>Perlman</u>, 918 F.2d at 1247-49, the Fifth Circuit rejected a lessee's claim that an oil and gas lease should be declared unenforceable, pursuant to the lease's force majeure clause.  The lessee invoked force majeure because Wyoming state regulators required the lessee to pay for studies before drilling using the lessee's patented "Perlman method," since the method used substantial amounts of water.  The lessee "concluded unilaterally that the actions of the Wyoming regulators hindered his performance under the contract.  He also unilaterally concluded that because Montana regulated its water similarly or more stringently than Wyoming, he would also be hindered there."  <u>Id.</u> at 1247.  The lessee also claimed that because Wyoming regulators required these studies before drilling, that the lessee was "hindered [by] his inability to obtain governmental permits or approvals necessary or convenient to [his] operations."  <u>Id.</u> at 1248.  The Fifth Circuit upheld the district court and rejected the lessee's force majeure declaration, stating that the lessee's "self-serving conclusion that a force majeure condition existed was at best merely speculation as to what might have happened had he attempted to drill the wells as planned."  <u>Id.</u> at 1249.

Agreement, force majeure is not applicable to hypothetical, possible events which may affect Sherwin Alumina's performance in the future.  (Supply Agreement, Attach. 1, ¶ 7).[25]  Accordingly, Sherwin Alumina's concern over possible future events does not entitle Sherwin Alumina to declare force majeure under the contract.  (<u>Id.</u>).

>    5.    <u>**Sherwin Alumina Has Demonstrated that it can Continue to Produce Calcined Alumina Products for AluChem**</u>

Finally, On May 2, 2006, a Sherwin Alumina employee sent an email to an AluChem employee stating as follows:

> the agreement that we reached with you last Friday, implied that we had ***withdrawn our Force Majeure***.  Under that Friday agreement, we committed to make product for AluChem, under controlled conditions, on an ongoing basis, over the next six months. ... It seems, therefore, that we are now, really only quibbling over the additional price incentive we agreed.

(Email from Peter Bailey to Ronald Zapletal, May 2, 2006) (emphasis added).

If it really were beyond Sherwin Alumina's reasonable control to produce calcined alumina products for AluChem, then Sherwin Alumina could not have agreed to "withdraw" its force majeure

---

[25]Also of note, other areas of the Sherwin Alumina plant, other than kiln 8 used to manufacture the calcined alumina products, have been the subject of environmental concerns and have been fined for emissions.  (IPTC Tr., 114:9-11, 115:10-15).  However, Sherwin Alumina did not shut down those areas of the plant and declare force majeure on the customers who use that equipment.  (IPTC Tr., 114:12-14).

declaration and produce further products for AluChem for a period of time.  (Id.; Supply Agreement, Attach. 1, ¶ 7; Email from Houshang Shams to Ed Butera, May 7, 2006, "we have made our preparation to run one more time".).[26]

For all of the reasons set forth above, there is no genuine issue of material fact that Sherwin Alumina was not entitled to declare force majeure under the Supply Agreement, and Sherwin Alumina's declaration of force majeure does not excuse Sherwin Alumina's performance under the Supply Agreement.

## C. **AluChem is Entitled to Specific Performance of the Supply Agreement**

Under Texas law, specific performance is an equitable remedy that is normally available only when the complaining party cannot be fully compensated through the legal remedy of damages, or when damages may not be accurately ascertained.  See Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 153 (5th Cir. 2004); see also Madariaga v. Morris, 639 S.W.2d 709, 711 (Tex. Civ. App. 1982) ("The equitable remedy of specific performance is not ordinarily available when the complaining party can be fully compensated through the legal remedy of damages"); Guzman v. Acuna, 653 S.W.2d 315, 318 (Tex. App.--San Antonio 1983) ("Specific performance is

---

[26]Also of note, since the commencement of this litigation, Sherwin Alumina has been producing calcined alumina for AluChem at an increased price.  Sherwin Alumina would not be able to undertake this production if it really were beyond its reasonable control to produce calcined alumina.

warranted where the remedies at law are inadequate and the existence of a valid contract is established."); <u>Estate of Griffin v. Sumner</u>, 604 S.W.2d 221, 225 (Tex. Civ. App. 1980) ("The purpose of specific performance is to compel a party who is violating a duty to perform under a valid contract to comply with his obligations.").

Texas Business & Commerce Code § 2.716(a) (Tex. UCC) states that "[s]pecific performance may be decreed where the goods are unique or in other proper circumstances." Tex. Bus. & Comm. Code § 2.617(a); <u>see also</u> <u>Madariaga</u>, 639 S.W.2d at 711 (the buyer "does not have an adequate remedy at law and cannot be adequately compensated in damages. This is apparent from the subject matter of the sale. The business, including the hot sauce formula and goodwill, has a special, peculiar, unique value or character; it consists of property which [the buyer] needs and could not be obtained elsewhere."). "The scarcity of a chattel has been recognized as an important factor in determining whether specific performance of a contract for its sale will be granted." <u>Madariaga</u>, 639 S.W.2d at 711 (citing 71 Am.Jur.2d, Specific Performance §§ 153 and 156).[27]

In this case, the undisputed facts demonstrate as follows: (1) that the current market for calcined alumina is very tight; (2)

---

[27]"Chattel" is defined by Black's Law Dictionary as "[a]n article of personal property, as distinguished from real property. A thing personal and movable." Black's Law Dictionary 236 (6th. ed. 1990).

that the calcined alumina products provided by Sherwin Alumina to AluChem are unique products, manufactured by very few entities; and (3) AluChem absolutely needs these products to survive in its business.  See Mineral Price Watch (major United States alumina supplier stating that "[t]he entire supply chain is essentially running with no inventory ... there is no material available and no safety stocks."); IPTC Tr., 186:24-187:5 (testimony of Ed Butera, AluChem Vice President of Marketing and Sales and one-third company owner, regarding the scarcity of worldwide suppliers of calcined alumina products); IPTC Tr., 160:19-161:7 (testimony of Ed Butera stating that AluChem "is not able to get raw materials because of the current supply situation in the world. [Without calcined alumina products] [w]e would not be able to process product.  We would not be able to ship to customers. AluChem, Inc. would go out of business.").  Moreover, the undisputed facts show that since Sherwin Alumina made its declaration of force majeure, AluChem has undertaken extensive efforts to secure an alternative supply of calcined alumina products, including looking overseas and trying to acquire its own production facility.  (IPTC Tr., 159:20-160:6). However, in the short term, if Sherwin Alumina terminates the Supply Agreement before its term is up on December 31, 2007, AluChem will not be able to obtain the calcined alumina products it requires for its business, as a result of the current worldwide tight supply. (IPTC Tr., 160:21-161:7).

In sum, the undisputed facts show that the calcined alumina products produced by Sherwin Alumina are both unique and necessary for AluChem's business. (Mineral Price Watch; IPTC Tr., 186:24-187:5, 160:19-161:7). Accordingly, under Tex. Bus. & Comm. Code § 2.716, which decrees specific performance "where the goods are unique", AluChem is entitled to specific performance for the duration of the Supply Agreement, until the Agreement terminates on December 31, 2007.[28]

---

[28]By its terms, the Supply Agreement terminates on December 31, 2007. (Supply Agreement, Attach. 3, ¶ 3). Sherwin Alumina now advances a new theory that the Agreement should terminate earlier, pursuant to a portion of the Agreement's pricing section. The pricing section contains a provision that states that the AQP (average quarterly natural gas price) "will be capped at $6.00 per mmBTU." (Supply Agreement, Attach. 2, ¶ 1). The provision states that "[s]hould the AQP exceed the cap amount the parties agree to meet in good faith to renegotiate the price section of the contract. Should the parties fail to reach agreement in 60 days, either party may cancel the contract by giving the other party a letter of intent to cancel with 6 months notice." (Id.). The cap was exceeded at the end of 2005/start of 2006, and the parties accordingly re-negotiated the pricing section of the Agreement. (IPTC Tr., 162:22-25; 168:15-169:19). Sherwin Alumina now contends that at the end of each quarter, if the AQP exceeds $6.00 per mmBTU, the parties are to re-negotiate the pricing section of the contract, and if an agreement is not reached, Sherwin Alumina can terminate the contract in six months. Sherwin Alumina claims that under this quarterly trigger provision, Sherwin Alumina can terminate the contract prior to December 31, 2007. This claim turns on interpreting the Supply Agreement, which is governed by Texas law. (Supply Agreement, Attach. 2, ¶ 3.). Under Texas law, the Court's primary concern "is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." Interstate Contracting Corp. v. City of Dallas, 407 F.3d 708, 712 (5th Cir. 2005). Whether a contract is ambiguous is a matter of law, and a contract is ambiguous only if its meaning is doubtful or reasonably susceptible to multiple interpretations. See id.; Reliant Energy Servs., Inc. v. Enron Canada Corp., 349 F.3d 816, 821-22 (5th Cir. 2003). In this case, the pricing provision of

D.   **Sherwin Alumina Is Not Excused from Performance Under the Supply Agreement Under the Doctrines of Mutual Mistake, Commercial Impractability, or Illegal Contract**

In its response brief, Sherwin Alumina contends that it is excused from performance under the Supply Agreement pursuant to the doctrines of mutual mistake, commercial impractability, and illegal contract.  For the reasons set forth below, there is no genuine issue of material fact that the above-referenced doctrines do not excuse Sherwin Alumina from contract performance.

1.   **Mutual Mistake**

Under Texas law, an agreement may be avoided where the parties contracted under a misconception or a mistake of a material fact.

---

the Supply Agreement is not ambiguous, as it is subject to only one meaning: that once the AQP exceeds $6.00 per mmBTU, the parties are to re-negotiate the pricing section of the contract. That is exactly what happened in late 2005/early 2006 – the AQP exceeded the cap, and the parties renegotiated the pricing section, agreeing to let the gas price float in the future. (IPTC Tr., 162:22-25; 168:15-169:19).  It is non-sensical to have a cap that re-sets every quarter, once the cap is exceeded, it is exceeded, and once the re-negotiation takes place, the provision has been fulfilled.  Also of note, there is only one place in the Supply Agreement that discusses the $6.00 cap, and it does not make any reference to quarterly negotiations.  (Supply Agreement, Attach 2, ¶ 1).  Rather, the only part of the Agreement that addresses quarterly discussions of price does not make reference to the $6.00 cap and re-negotiation provision of the contract. (Id.).  Based on the above, Sherwin Alumina cannot now attempt to terminate the contract prior to December 31, 2007, based on its erroneous interpretation of the AQP price cap provision.  By its very terms, the AQP cap provision was a one-time occurrence, it was triggered at the end of 2005/early 2006, the parties re-negotiated the pricing provision of the Agreement, and Sherwin Alumina cannot now attempt to use this provision for an early contract termination.

See Williams v. Glash, 789 S.W.2d 261, 264 (Tex. 1990) ("Pursuant to the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided."). Where a mutual mistake exists, the parties are entitled to rescind their contract and be restored to the positions they held before entering the contract. See Green v. Morris, 43 S.W.3d 604, 606 (Tex. App.--Waco 2001). A mistake that justifies rescission of a contract must be a mutual, not a unilateral, mistake. See Ledig v. Duke Energy Corp., 2006 WL 727712, *5 (Tex. App.--Houston [1st Dist.] 2006). Parties are only entitled to rescind their contract when both parties acted under the same misunderstanding of the same material fact. See Green, 43 S.W.3d at 606; Coastal Terminal Operators v. Essex Crane Rental Corp., 2004 WL 1795355, *7 (Tex. App.--Houston [14th Dist.] 2004).

The party seeking to avoid the contract bears the burden of showing a mutual mistake. See Santos v. Mid-Continent Refrigerator Co., 471 S.W.2d 568, 569 (Tex. 1971). The party seeking rescission on the grounds of mutual mistake must show "(1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed-upon exchange." de Monet v. PERA, 877 S.W.2d 352, 357 (Tex. App.--Dallas 1994) (citing Restatement (Second) of Contracts § 152 (1981)). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent, ... but rather solely by objective circumstances surrounding execution" of

the contract.  Williams, 789 S.W.2d at 264.

The undisputed facts demonstrate that there is no mutual mistake in this case.  Before ever entering into the Supply Agreement, Sherwin Alumina conducted trial runs in producing calcined alumina using kiln 8.  (IPTC Tr., 65:19-22, 68:12-14; Ingersoll Dep., 129:20-130:5; Ingersoll Aff., ¶ 2; Ballou Aff., ¶ 6).  Reportable events regarding dust emissions took place during each of those trial runs.  (IPTC Tr., 69:9-12; 71:11-12).  Sherwin Alumina was fully aware of dust emission problems that had to be reported to TCEQ **before** Sherwin Alumina entered into any contract with AluChem.  (Id.).  Sherwin Alumina cannot now claim that this dust emission issue, which it knew of prior to contracting with AluChem, constitutes a mutual mistake that excuses Sherwin Alumina from its obligations under the Supply Agreement.  At best, Sherwin Alumina's situation can be characterized as a miscalculation that Sherwin Alumina could make money selling calcined alumina products to AluChem under the Supply Agreement.  This does not constitute a "mutual mistake" under Texas law.  See Barker v. Roelke, 105 S.W.3d 75, 84 (Tex. App.--Eastland 2003) ("The doctrine of mutual mistake must not routinely be available to avoid the results of an unhappy bargain.  Parties should be able to rely on the finality of freely bargained agreements.").

### 2.   Commercial Impracticability

Under Texas law, the doctrine of commercial impracticability

constitutes a defense to the performance of a contract.  See Centex
Corp. v. Dalton, 840 S.W.2d 952, 954 (Tex. 1992); N. Natural Gas
Co. v. Chisos Joint Venture I, 142 S.W.3d 447, 457 (Tex. App.--El
Paso 2004).   Texas courts apply the doctrine of commercial
impracticability as it is defined in the Restatement (Second) of
Contracts, Section 261.  See Tractebel Energy Mktg., Inc. v. E.I.
Du Pont De Nemours & Co., 118 S.W.3d 60, 65 (Tex. App.--Houston
[14th Dist.] 2003) ("we find the doctrine of commercial
impracticability as defined in the Restatement does exist in
Texas.").  Section 261 of the Restatement (Second) of Contracts
states as follows:

> § 261.  Discharge by Supervening Impracticability.
>
> Where, after a contract is made, a party's performance is
> made impracticable without his fault by the occurrence of
> an event the non-occurrence of which was a basic
> assumption on which the contract was made, his duty to
> render that performance is discharged, unless the
> language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1981); see also BP Chems.,
Inc. v. AEP Texas Cent. Co., 198 S.W.3d 449, 457 (Tex. App.--Corpus
Christi 2006) (internal citations omitted) ("the doctrine of
commercial impracticability applies where ... a party's performance
is made impracticable ... by the occurrence of an event the
non-occurrence of which was a basic assumption on which the
contract was made.").

"[A] party claiming the defense [of commercial
impracticability] ***must use reasonable efforts to surmount the***

**obstacle to performance**". <u>Tractebel Energy Mktg., Inc.</u>, 118 S.W.3d
at 68 (emphasis added); <u>see</u> <u>also</u> Restatement (Second) of Contracts,
Sections 261, 264 (1981) ("a party is expected to use reasonable
efforts to surmount obstacles to performance ... and a performance
is impracticable only if it is so in spite of such efforts.").[29]

In this case, the undisputed facts show that there is no
commercial impracticability.  The problem of dust emissions from
kiln 8, which had to be reported to TCEQ, was a problem that was
known to Sherwin Alumina before entering into the contract with
AluChem.  (IPTC Tr., 65:19-22, 68:12-14; Ingersoll Dep., 129:20-
130:5; Ingersoll Aff., ¶ 2; Ballou Aff., ¶ 2).  Sherwin Alumina
experienced dust emission reportable events while conducting trial
runs, before Sherwin Alumina entered into the Supply Agreement.
(<u>Id.</u>).Accordingly, the dust emission problem was not an "occurrence

---

[29]The Restatement contains the following illustration
regarding reasonable efforts:

> An illustration makes clear that a party blaming
> governmental regulations for nonperformance must pursue
> all remedies reasonably available to avoid them:  A
> contracts to construct and lease to B a gasoline service
> station.  A valid zoning ordinance is subsequently
> enacted forbidding the construction of such a station but
> permitting variances in appropriate cases.  [A] makes no
> effort to obtain a variance, although variances have been
> granted in similar cases, and fails to construct the
> station.  A's performance has not been made
> impracticable.  A's duty to construct is not discharged,
> and A is liable to B for breach of contract.

<u>Tractebel Energy Mktg., Inc.</u>, 118 S.W.3d at 69 (citing
Restatement (Second) of Contracts, Section 261 illus. 11 (1981)).

of an event the non-occurrence of which was a basic assumption on which the contract was made", as is required for commercial impractability.  BP Chems., Inc., 198 S.W.3d at 457.  Moreover, Sherwin Alumina did not engage in reasonable efforts to overcome the issue of dust emissions, which would have included at least requesting an amendment to their TCEQ permit for kiln 8--something Sherwin Alumina had done many times for other areas of the plant, but did not even attempt with regard to kiln 8 calcined alumina production.[30]  (IPTC Tr., 225:18-226:6).  Based on the above, Sherwin Alumina is not excused from contract performance under the doctrine of commercial impractability.  See Tractebel, 118 S.W.3d at 65.

### 3.  Illegal Contract

Under Texas law, "a contract to do a thing which cannot be performed without a violation of the law is unenforceable." Gupta v. Eastern Idaho Tumor Institute, Inc., 140 S.W.3d 747, 751 Tex. App.--Houston [14th Dist.] 2004; Villanueva v. Gonzalez, 123 S.W.3d 461, 464 (Tex. App.--San Antonio 2003) ("A contract to do a thing

---

[30]Moreover, the undisputed facts show that compliance with the kiln 8 TCEQ permit is not impossible, but rather would cost Sherwin Alumina money to upgrade its kiln 8 technology.  (S. Bailey Mem., p. 4).  This does not constitute commercial impractability, since changes in economic circumstances do not alone render performance impracticable and relieve a party of its contractual obligations.  See N. Natural Gas Co., 142 S.W.3d at 456-58 (finding no commercial impracticability where a government order left a contracting party "with an expense obligation and no corresponding income", but the order did not "rise to the level of [a] direct prohibition".).

which cannot be performed without violation of the law violates public policy and is void."); DiFrancesco v. Houston Gen. Ins. Co., 858 S.W.2d 595, 598 (Tex. App.--Texarkana 1993) ("It is a familiar law of contracts that an illegal agreement is unenforceable").

In this case, the Supply Agreement is not an "illegal contract." An illegal contract is one that cannot be performed without a violation of the law. See Villanueva, 123 S.W.3d at 464. The undisputed facts show that it was possible for Sherwin Alumina to continue to produce calcined alumina products for AluChem within the standards set forth in the TCEQ permit, albeit at a higher cost due to equipment upgrades. (S. Bailey Mem., p. 4; Ingersoll Aff., ¶ 5). The Supply Agreement did not require Sherwin Alumina to do anything illegal to comply with its terms. Rather, to perform under the Supply Agreement, Sherwin Alumina may have had to spend more money than it had anticipated to produce calcined alumina products using kiln 8. (Id.). This is not an illegal contract, and the illegal contract doctrine does not excuse Sherwin Alumina's performance under the Supply Agreement.[31]

---

[31]Sherwin Alumina also contends that it is not obligated to perform under the Supply Agreement based on "lack of financial security." (D.E. 29, Response, p. 2, ¶ 3, p. 13, ¶ 4.9). Sherwin Alumina does not elaborate on this argument at all in its response brief, rather, Sherwin Alumina only contends that it should be excused from contract performance for this reason. The only information regarding Sherwin Alumina's "lack of financial security" claim is in Sherwin Alumina's Answer to AluChem's Original Complaint, where Sherwin Alumina claims as an affirmative defense that pursuant to a provision in the Supply Agreement, Sherwin Alumina should be released from the contract because "Sherwin Alumina has become insecure in doing business

## V.   Conclusion

For the reasons set forth above, there is no genuine issue of material fact that the circumstances of this case do not constitute grounds for Sherwin Alumina to exercise the force majeure provision in the Supply Agreement, and there is no genuine issue of material fact that AluChem is entitled to specific performance of the terms of the Supply Agreement.  Accordingly, AluChem's first motion for summary judgment (reinstated D.E. 16) is hereby GRANTED in its entirety, and Sherwin Alumina is hereby ORDERED to comply with the terms of the Supply Agreement until the Agreement's termination on December 31, 2007.

SIGNED and ENTERED this 19th day of March, 2007.

Janis Graham Jack
United States District Judge

---

with AluChem."  (D.E. 13, Case No. 06-210).  Under Texas law, Sherwin Alumina bears the burden of proving the happening of a contingency that would excuse Sherwin Alumina from liability. See Hassell Const. Co., Inc. v. Stature Commercial Co., Inc., 162 S.W.3d 664, 667 (Tex. App.--Houston 2005 ("The burden of proving the happening of a contingency which, by the terms of the contract, would discharge the party from liability ... is on the party who seeks to avoid the contract or excuse a failure to perform it on that ground"); Decker v. Commercial Credit Equip. Corp. 540 S.W.2d 846, 849 (Tex. Civ. App. 1976); (same).  In this case, in its response brief, Sherwin Alumina does not provide any information *at all* as to why this particular provision of the contract should be invoked, and why Sherwin Alumina should be released from its contractual obligations based on "financial insecurity."  Accordingly, Sherwin Alumina has not carried its burden, and Sherwin Alumina is not excused from contract performance by its bare assertion of financial insecurity.  See id.